IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

JUDY WEEKES-WALKER, *et al.*,    )
        )
    Plaintiffs,      )
        )
v.        )    CASE NO. 3:10-cv-895-MEF
        )    [WO – Publish]
MACON COUNTY GREYHOUND    )
PARK, INC., a/k/a VictoryLand,    )
        )
    Defendant.      )

## MEMORANDUM OPINION AND ORDER

This Rule 23(b)(3) class action brought by former employees of Defendant Macon County Greyhound Park, Inc. ("MCGP"), pursuant to the Worker Adjustment and Retraining Act of 1988 ("WARN"), 29 U.S.C. §§ 2101 *et seq.*, alleges that MCGP – on three separate occasions in 2010 – violated the WARN Act's requirement to give sixty days notice to affected employees prior to a plant closing or mass layoff, as defined in the statute. The class action is now before the Court on Plaintiff's motions to strike affirmative defenses and for partial summary judgment on liability (Docs. # 43, 44) and Defendant's motion for summary judgment (Doc. # 73). After careful consideration of the arguments of counsel and the relevant law, the Court finds that Plaintiff's motion for partial summary judgment on liability is due to be GRANTED and Defendant's motion for summary judgment is due to be DENIED.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 2104(a)(5) (WARN Act may be enforced in federal district court). The parties do not contest personal jurisdiction or venue, and there are adequate allegations in support of both.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." ).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quotation omitted).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

2

If the movant satisfies its evidentiary burden, the non-moving party must then establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); Fed. R. Civ. P. 56(c). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation and internal quotation marks omitted).

A genuine dispute as to a material fact can be found only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Greenberg*, 498 F.3d at 1263. However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 242 (citations omitted). Likewise, "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment[,]" *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio*

3

*Corp.*, 475 U.S. 574, 586 (1986).  Furthermore, a nonmoving party's "conclusory allegations . . . in the absence of supporting evidence, are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); *see also Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact . . . .") (emphasis in original).

When a nonmovant fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

## III.  BACKGROUND

On the South side of I-85 North (which traverses Alabama mostly from West to East, or latitudinally) sits the mostly[1] vacant but still imposing collection of structures and parking decks that made up Macon County Greyhound Park, Inc., more commonly referred to as VictoryLand.  Once a small-scale greyhound track in rural Alabama, then a multi-multi million dollar casino offering electronic bingo, the site now stands as a mausoleum to a short period of Alabama history when vast profits were made (legally or illegally) off of a game which its sponsors held out as electronic charity bingo.

---

[1]  VictoryLand has since suspended live greyhound racing, but still offers simulcast sessions and dining.

4

This case is between MCGP and its former employees, and mostly concerns the last year or so of MCGP's existence.  The beginning of the end for electronic charity bingo at MCGP can be traced back to December 30, 2008, when then-Governor Bob Riley issued Executive Order No. 44, which created the Governor's Task Force on Illegal Gambling. Seizures of electronic bingo machines at other Alabama establishments offering the game known as electronic charity bingo resulted in litigation, and on November 13, 2009, the Alabama Supreme Court issued a decision in *Barber v. Cornerstone Comm'y Outreach, Inc.*, 42 So. 3d 65 (Ala. 2009).  Construing the term "bingo" in Lowndes County's Local Amendment No. 674 authorizing charity bingo in Lowndes County (which is nearly identical to Macon County's Amendment No. 744), the Supreme Court of Alabama engaged in a comprehensive discussion of the definition of "bingo" and, based upon its arrived at definition, dissolved a lower court's preliminary injunction against the Task Force, reasoning that the gaming operators "failed to introduce substantial evidence from which the trial court reasonably could have concluded that [the respondent gaming operators] had a 'reasonable likelihood of success' in proving that the electronic gaming machines seized . . . constituted the game of bingo."  *Id.* at 86.

The ramifications of the Alabama Supreme Court's decision in *Cornerstone* traveled up I-85 well in excess of the posted 70 mile per hour speed limit, and MCGP would soon commence its own litigation in an ultimately futile effort to keep Governor Riley's Task Force at bay.

5

In the interim, on January 5, 2010, MCGP laid off 68 employees because of planned renovations to the facility's North Gaming Section.[2]  (Pls.' Mot. 9 (Doc. # 44); Def.'s Br. in Support 3 (Doc. # 74); Def.'s Resp. 3 (Doc. # 56).)   The layoffs were expected to be temporary in nature and MCGP admits that "it did not provide WARN notices to those employees . . . ."  (Def.'s Resp. 3; (Doc. # 106, at 2).)  Moreover, MCGP avers that it "did not have any knowledge that the Governor's Task Force on Gambling would attempt to raid its facility one month later."  (Def.'s Resp. 4.)

Meanwhile, the Supreme Court of Alabama denied rehearing in the *Cornerstone* case on January 29, 2010.  That very day, John M. Tyson, Jr., the task force commander and special prosecutor for the Governor's Task Force, arrived at MCGP for the purpose of seizing MCGP's bingo machines.  Fortunately, it appears that MCGP was prepared for such an event, because it had a complaint ready to be filed that very morning.  *Macon Cnty. Greyhound Park, Inc. d/b/a VictoryLand v. John M. Tyson, Jr.*, No. 10cv9 (Cir. Ct. Macon Cnty. Jan. 29, 2010) (Alacourt summary).  The litigation effort against the Governor's Task Force started well enough, when the Circuit Court of Macon County entered a temporary restraining order.  *Tyson v. Macon Cnty. Greyhound Park, Inc., d/b/a VictoryLand*, 43 So. 3d 587, 589 (Ala. Feb. 4, 2010). Tyson countered with an emergency motion in the Alabama Supreme Court to vacate the restraining order, arguing that the Alabama courts lacked

---

[2]  The parties have stipulated (Doc. # 106) that MCGP is a "single site of employment" as that term is used in the WARN Act and defined in the regulations, *see* 20 C.F.R. 639.3(i), and case law, *Int'l Union, United Mine Workers*, 6 F.3d at 722 (11th Cir. 1993).

subject matter jurisdiction to enjoin criminal prosecutions and investigations.  The Alabama Supreme Court agreed, issuing its opinion on February 4, 2010.  *Id.*

Knowing that a raid was imminent, MCGP closed its doors on February 4, 2010,[3] the day that the Alabama Supreme Court dissolved the Macon County Circuit Court's temporary restraining order.  It is undisputed that MCGP laid off all of its remaining employees (most were hired back in March) and admits and stipulates that "[n]o formal letter was sent to MCGP's employees pertaining to the layoff . . . ."  (Br. in Support 4; Benefield Aff. ¶ 9; (Doc. # 106, at 3).)  However, MCGP notes that it was "entirely obvious" to MCGP's employees what was taking place due to both the events on the ground (the appearance of hundreds of state troopers prepared to seize the bingo machines) and the extensive media coverage of MCGP's stand off with the Task Force.  After shutting its doors on February 4, 2010, MCGP arranged a meeting to discuss unemployment issues with its employees, and posted on its website and interstate billboards that it was closed due to the Task Force's actions.  It is undisputed that none of these communications, either verbal, electronic, in print, or in large print (on billboards), contained any discussion of or reference to the WARN Act or MCGP's reasons for not complying with the WARN Act's sixty day notice requirement.

---

[3]  Plaintiffs had advanced arguments in their briefing that MCGP closed on February 2, 2010, but has since stipulated that "[t]here was a temporary shutdown of Defendant MCGP on February 4, 2010[.]"  (Doc. # 106.)

On March 5, 2010, several Macon County officials and citizens filed another lawsuit in Macon County Circuit Court alleging, in essence, that the Governor's Task Force either lacked authority to investigate and prosecute crimes in Macon County or that it had displaced the authority vested in Macon County's duly elected officials.  *Tyson v. Jones*, 60 So. 3d 831, 837 (Ala. 2010) (specifically, a "quo warranto" action).  Again, the litigation started well enough for MCGP.  On the same day that the complaint was filed, the Macon County Circuit Court entered another temporary restraining order in favor of the Macon County plaintiffs. *Id.*  It appears that MCGP was prepared for good news.  The effective time of the order was 12:45 p.m., and MCGP had resumed operations within fifteen minutes.  *Id.*  The Macon County Circuit Court turned the temporary restraining order into a preliminary injunction, *id.* at 840, from which the Task Force defendants appealed to the Alabama Supreme Court. On July 30, 2010, the Alabama Supreme Court returned a unanimous opinion reversing the Macon County Circuit Court, which dissolved the injunction that effectively allowed MCGP continue its operations unmolested by the Governor's Task Force.

On August 9, 2010, only days after the Alabama Supreme Court's negative ruling in *Tyson*, the Task Force was again preparing to raid MCGP's facilities, and MCGP again shut its doors to electronic bingo for the final time.  As with the February closing, it is undisputed and stipulated that MCGP did not provide to its employees any formal letter pertaining to the layoff.  (Def.'s Br. in Support 6 ("MCGP notified its employees and customers of the reasons for this closing via internet and other media . . . that its electronic bingo operations, including

the restaurants and hotels dependant on the operation of electronic bingo, would be closed until further notice."); Pl.'s Mot. for Partial Summ. J. ("Again, without WARN notice to employees, [MCGP] closed its plant and laid off 600 employees on August 9, 2010."); (Doc. # 106, at 3).)

This litigation commenced in October 2010, when Plaintiffs filed their Complaint. (Doc. # 1.)  The Court certified the case as a Rule 23(b)(3) class action with three sub-classes based upon the dates of termination (January, February, or August 2010), and class notice has been issued.  (Docs. # 66, 100.)  Plaintiffs seek partial summary judgment on liability under the WARN Act for all three alleged WARN Act incidents, and Defendants seek summary judgment generally, arguing that the January 2010 layoff or plant closing was not a covered WARN Act incident and that the February and August 2010 layoffs or plant closings are subject to the WARN Act's "unforeseeable business circumstances" and/or "good faith" defenses.

## IV.  DISCUSSION

### A.    The WARN Act

In a nutshell, the WARN Act "requires that an employer provide sixty days notice to workers before ordering a [plant closing or] mass layoff." *Int'l Union, United Mine Workers v. Jim Walter Res., Inc.*, 6 F.3d 722, 724 (11th Cir. 1993) (citing 29 U.S.C. § 2102(a)).  The WARN Act's legislative purpose is to secure for workers ample notice that their employment

will be terminated so that they can better prepare themselves for reentry into the job market.

The Third Circuit has placed the WARN Act in context and summarized its purpose:

> The WARN Act was adopted in response to the extensive worker dislocation that occurred in the 1970s and 1980s. As companies were merged, acquired, or closed, many employees lost their jobs, often without notice. In some circumstances, the projected closing was concealed from the employees. Congress enacted WARN to protect workers and their families from these situations. WARN's notice period was designed to allow workers 'to adjust to the prospective loss of employment, to seek and obtain retraining that will allow [them] to successfully compete in the job market.' [20 C.F.R. § 639.1(a)]. The thrust of WARN is to give fair warning in advance of prospective plant closings [or mass layoffs].

*Hotel Emps. Local 54 v. Elsinore Shore Assoc.*, 173 F.3d 175, 182 (3d Cir. 1999).

The Court briefly addresses the elements of Plaintiffs' WARN Act cause of action. A WARN Act claim requires that the plaintiff show that: (1) the closing or layoff was a covered event (i.e., a mass layoff or plant closing, as those terms are defined in the statute); (2) that the defendant was an "employer" as defined in the statute; and (3) that the plaintiffs are "affected employees" as defined in the statute. *See Bradley v. Sequoyah Fuels Corp.*, 847 F. Supp. 863, 867-68 (E.D. Okla. 1994); *Allen v. Sybase, Inc.*, 468 F.3d 642, 654-55 (10th Cir. 2006).

First, it is undisputed and the parties have stipulated that MCGP was an "employer" during the relevant time periods as that term is defined in 29 U.S.C. § 2101(a)(1) (business enterprise that employs 100 or more employees, excluding part-time employees).

Second, Plaintiffs must show that the January, February, and August 2010 layoff and closings were covered events. A "plant closing" is defined as:

the permanent or temporary shutdown of a single site of employment, or one or more facilities within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees.

§ 2101(a)(2).[4]

A "mass layoff" is defined as:

a reduction in force which . . . (A) is not the result of a plant closing; and (B) results in an employment loss at the single site of employment during any 30-day period for . . . (i)(I) at least 33 percent of the employees (excluding any part-time employees); and (II) at least 50 employees (excluding any part-time employees); or (ii) at least 500 employees (excluding part-time employees)[.]

§ 2102 (a)(3).

## B.   **The January and February 2010 Layoff and Plant Closing**

### 1.   *The January 5, 2010 Layoff is Not a Covered Event*

With respect to the January 5, 2010 layoffs, the parties have agreed to the following relevant stipulations. First, the parties have agreed that 68 full time "affected employees" suffered an "employment loss" on January 5, 2010. (Doc. # 106, at 1.)  The parties have further stipulated that the number of full time employees at MCGP as of November 6, 2009 (60 days prior, as per 20 C.F.R. § 639.5(a)(2)) was 865 (Doc. # 106, at 2).  As a result of

---

[4]    A few more terms appearing within this definition need explanation.  First, an "employment loss" "means (A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period."  § 2101(a)(6).  Second, "the term 'part-time employee' means an employee who is employed for an average of fewer than 20 hours per week or who has been employed for fewer than 6 of the 12 months preceding the date on which notice is required."  § 2101(a)(8).  In calculating the average hours, "[t]he [relevant] period . . . is the shorter of the actual time the worker has been employed or the most recent 90 days."  20 C.F.R. § 639.3.

these agreed-upon numbers, the parties have also stipulated that the number of layoffs constituted less that 33% of MCGP's full time employees.

Essentially, the parties have agreed that, standing alone, the January 5, 2010 layoff was not a covered event under WARN.  MCGP is a "single site of employment," *supra* n.2, which prevents Plaintiffs from asserting that the January 5, 2010 layoff was a "plant closing" based upon the temporary shutdown of the North Gaming Section.  Since it cannot be a plant closing, the January 2010 layoff is either a "mass layoff" or not a covered event at all.  As stated above, for this layoff of 68 full time employees to be considered a "mass layoff" under WARN, the layoff must constitute at least 33 percent of the total number of employees.  As of November 6, 2009 (sixty days prior to January 5, 2010), MCGP employed 865 full time employees.  Thus, the January 5, 2010 layoff constituted approximately 7.8% of MCGP's full time employees.

Having determined as much, the January 5, 2010 sub-class of Plaintiffs must rest their hopes on being able to aggregate their numbers with the February 4, 2010 plant closing.

### 2.    *The February 4, 2010 Closing is a "Plant Closing"*

With respect to the February 4, 2010 closing, the parties have agreed to the following relevant stipulations.  Concerning the number of full time employees who suffered an employment loss, the parties have stipulated that "[m]ore than 50 full time 'affected employees' at Defendant MCGP suffered an 'employment loss,' as that term is defined in the WARN Act at 29 U.S.C. § 2101(a)(6), at [MCGP] during a 30 day period."  (Doc. # 106, at

2.)  In fact, the parties have agreed that 249 full time employees suffered an "employment loss" as a result of the February 4, 2010 plant closing.  Furthermore, the parties have agreed that "less than 33% of the full time 'affected employees' at Defendant MCGP that were employed as of December 6, 2009 [864 employees] suffered an 'employment loss' as a result of the February shutdown."  (Doc. # 106, at 2.)  The parties have also agreed that there occurred a "temporary shutdown" at MCGP on February 4, 2010.

In order to enter partial summary judgment for Plaintiffs on liability as to the February 4, 2010 closings, the Court must be satisfied that there is no genuine issue of material fact that either a "mass layoff" or "plant closing" actually occurred.  As an initial matter, the definitions section of WARN makes clear that if an event could be considered both a "mass layoff" or "plant closing," then a "plant closing" occurred.  *See* § 2101(a)(3)(A) (defining a "mass layoff" as a "reduction in force which . . . is not the result of a plant closing").

MCGP rests its argument that the February 4, 2010 closing was not a "plant closing" on the fact that MCGP re-opened in less than six months.  Acknowledging that no precedent exists in support of its proposition, MCGP argues "[i]t is illogical to claim that the alleged February 'plant closing' was the cause of any 'employment loss' when in fact the alleged 'plant closing' lasted less than 6 months."  (Def.'s Br. in Support 17 & n.10.)  Essentially, MCGP urges the Court to re-write Congress's definition of "plant closing" so as to include a six-month limitation because of its claimed illogicality if the Court did not do so.  MCGP's argument is to be rejected for two reasons.

13

First, this Court's commission is to interpret the law as passed by Congress, not to attempt to re-write it. The federal judiciary does not stand as a legislative super-committee. *Nat. Fed'n of Indep. Bus. v. Sebelius*, Nos. 11-393, 398, 400, 2012 WL 2427810, at *6 (June 28, 2012) (Roberts, C.J.) ("[The federal judiciary] does not consider whether [acts of Congress] embody sounds policies. That judgment is entrusted to the Nation's elected leaders."); *Eldred v. Ashcroft*, 537 U.S. 186, 222 (2003) ("The wisdom of Congress' action, however, is not within our province to second-guess."); *Pavelic & LeFlore v. Marvel Entm't Grp., Div. of Cadence Indus. Corp.*, 493 U.S. 120, 126 (1989) ("Our task is to apply the text, not to improve upon it."). To the contrary, Congress's intent is found in the words it has chosen to employ in a particular statute. *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 89 (1991) ("The best evidence of [Congress's] purpose is the statutory text adopted by both Houses of Congress and submitted to the President.").

With respect to the WARN Act, Congress specifically stated that a "plant closing" may be either permanent or temporary. § 2101(a)(2). Webster's Third defines "temporary" as "existing or continuing for a limited time." Webster's Third New International Dictionary 2353 (1986). Thus, Congress plainly intended for closings that only last for a limited time to fit within the definition of a "plant closing." The Court sees no reason to read into the statute an arbitrary limitation such as a bright line cut-off point of six months. *Washington v. Aircap Indus. Corp.*, 831 F. Supp. 1292 (D.S.C. 1993) ("'WARN is a remedial statute and must be construed broadly.'" (citing and quoting cases)). Furthermore, even if the Court

14

were to read in a minimum time limitation  for an event to qualify as a "plant closing," the duration of the shutdown at MCGP was approximately one month, which the Court considers to fit within Congress's intended meaning of "temporary shutdown" under § 2101(a)(2).

Second, WARN provides an outlet for employers who order a plant closing but then quickly re-open and re-hire most of their employees.  A "plant closing" requires at least 50 full time employees to suffer an "employment loss" at the single site of employment.  As stated above, a layoff of less than or equal to 6 months does not constitute an "employment loss."  § 2101(a)(6).  Thus, for example, if an employer orders a shutdown and then re-opens two weeks thereafter and re-hires all but thirty of its employees, no "plant closing" has occurred because there was not the requisite employment loss.  *See* 20 C.F.R. § 639.3(b) ("A 'temporary shutdown' triggers the notice requirement [for a plant closing] only if there are a sufficient number of terminations, layoffs exceeding 6 months, or reductions in hours of work as specified under the definition of 'employment loss.'").

Having rejected MCGP's proposed construction of "temporary shutdown," the Court concludes that the parties have essentially stipulated to a February 4, 2010 "plant closing" and WARN Act violation.  MCGP is an employer; there was a "temporary shutdown" at MCGP on February 4, 2010; as a result thereof, 249 full time employees were "affected employees" and suffered an employment loss; and MCGP "never mailed or personally served an individual written WARN Act notice to any 'afffected employee' before, at the time of,

or after any 'affected employee' suffered an 'employment loss' at Defendant MCGP on February 4, 2010."  (Doc. # 106, at 3.)

### 3.    The January 5, 2010 Layoff and February 4, 2010 Plant Closing Can Be Aggregated

As concluded above, by itself, the January 5, 2010 layoff does not meet the WARN Act's definition of either a "mass layoff" or "plant closing."  On the other hand, the February 4, 2010 temporary shutdown constituted a "plant closing" within the meaning of WARN. Since the February 4, 2010 shutdown was a "plant closing," WARN provides that any full time employees who suffered an "employment loss" "*during any 30-day period*" are entitled to count themselves as "affected employees" of the "plant closing."  § 2101(a)(2) (emphasis added).

Although Plaintiffs had initially argued that the February closing occurred on February 2, 2010, they now have stipulated that it occurred on February 4, 2010.  (Doc. # 106, at 2.) It just so happens that, if one counts dates exclusively, exactly thirty days elapsed (counting backwards from the day before the date of the "plant closing") between February 3, 2010 and January 5, 2010.  However, if one counts inclusively, then thirty-one days elapsed.  Thus, the Court must determine which of these two methods of date-counting the statute contemplates.

The Court begins with Federal Rule of Civil Procedure 6, which states that it "appl[ies] in computing *any time period* specified . . . in *any statute that does not specify a method of computing time*."  Fed. R. Civ. P. 6(a) (emphasis added).  The Eleventh Circuit endorses a "general policy of finding a legislative intent to apply Rule 6(a) to all federal

statutes enacted or amended subsequent to Rule 6(a)'s promulgation." *Maahs v. United States*, 840 F.2d 863, 867 (11th Cir. 1988); *see also Lee v. United States*, 977 F.2d 551, 552 (11th Cir. 1992). For computing a period stated in days, Rule 6 opts for the exclusive method of date-counting:

> When the period is stated in days . . . *exclude the day of the event that triggers the period*; count every day, including intermediate Saturdays, Sundays, and legal holidays; and include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.

Fed R. Civ. P. 6(a)(1)(A)-(C) (emphasis added). Thus, if one employs the exclusive method of date-counting put forth in the Federal Rules of Civil Procedure, exactly thirty days elapsed between Wednesday, February 3, 2010 (excluding the "triggering date" of February 4, as per Fed. R. Civ. P. 6(a)(1)(A)) and Wednesday, January 5, 2010. In such case, the January 2010 layoffs may be aggregated with the February "plant closing."

The question then becomes whether WARN "specif[ies] a method of computing time" for its thirty-day period that would displace the exclusive method of Rule 6. Although it is a close question, the Court finds that the statute does not sufficiently elaborate a specific method of computing time so as to effectuate an ouster of Rule 6's exclusive method. MCGP hangs its hat on Congress's use of the word "during." Webster's Third defines "during" as "at some point in the course of." Webster's Third New International Dictionary 703 (1986). A "course," in turn, is "the act or action of moving in a particular path from

point to point."[5]  Webster's Third at 522.  Importantly, these definitions do not carry much

significance or instruction with regard to where the "points" should be placed.  For example,

if one person tells another that a fur seal was in the lead *during* a race with Usain Bolt, it

would not give the listener much instruction on *where* the starting and ending points of the

race were located.  The race could be in the water (a most likely scenario) or on land or a

combination of both.  So it is with Congress's use of the phrase "during any 30-day period."

§ 2101(a)(2).  The phrase does not offer anything in the way of instructions on *where* the

starting and ending points for the thirty day period should be placed.  In the absence of such

instructions, the Court must defer to Rule 6(a)'s exclusive method of computing time.[6]

Furthermore, the Advisory Committee Notes regarding the 2009 Amendments to Rule

6 state that "[s]ubdivision (a) does not apply when computing a time period set by a statute

if the statute specifies a method of computing time.  *See, e.g.,* 2 U.S.C. § 394 (specifying

---

[5]  This definition of "course" is typically applied to a physical course, such as a race course. However, the Court views it as the most appropriate definition for "course" in this context because, as with a race course, in a specific course of days there is both a definite start (a point) and end (a point).

[6]  In fact, the regulations appear to specify a method of computing time that is consistent with Rule 6(a).  20 C.F.R. § 639.5(a)(1)(i) instructs employers to "[l]ook *ahead* 30 days and *behind* 30 days to determine . . . the aggregate for any 30-day period . . . ."  *Id.* (emphasis added).  Again, consulting the dictionary, "ahead" is defined as "at or toward a point of time *before another.*" Webster's Third at 44 (emphasis added).  Therefore, if something is "ahead" of another thing, it is not in a position equal to that thing; it is before that thing.  In other words, counting 30 days "ahead" means counting 30 days, *all* of which are ahead of the triggering date.  It is the same for "behind," which the dictionary defines as "in the past" or "gone by."  Webster's Third at 199.  The regulation instructs employers to count 30 days "in the past" or 30 days "gone by."  The date of the triggering event itself is not a date "gone by" or "in the past" of the triggering event.  In other words, the regulations tell employers to start counting the thirty days at [triggering event + 1] or [triggering event − 1].

18

method for computing time periods prescribed by certain statutory provisions relating to contested elections to the House of Representatives)."  Thus, 2 U.S.C. § 394 stands as an example of what a statute substantively must convey in order to set out its own methods for computing time.  Its comprehensiveness is in direct contradistinction to the five word phrase employed in § 2102(a)(2).

In light of the non-specificity of § 2102, the Court reverts to the "general policy" of applying Rule 6(a)'s method of computing time and defers to its exclusive method of date counting.  Accordingly, the Court finds that the January 5, 2010 layoffs may be aggregated with the February 4, 2010 plant closing.[7]

## C.    The August 2010 "Plant Closing"

Finally, with respect to the August 9, 2010 closing, the parties have stipulated that a "'plant closing' and/or 'mass layoff' occurred at Defendant MCGP as those terms are defined under the WARN Act at 29 U.S.C. § 2102(a)(2)."  (Doc. # 106, at 3.)  The parties further stipulate that "Defendant MCGP never mailed or personally served an individual written WARN Act notice to any 'affected employee' before, at the time of, or after any 'affected employee' suffered an 'employment loss' at Defendant MCGP on August 9, 2010."  (Doc. # 106, at 3.)  Thus, the parties have effectively stipulated that a "plant closing" occurred on August 9, 2010, and that there was a WARN Act violation.

---

[7] Thus, even if the February 4, 2010 closing is not a "plant closing," as MCGP has argued, it is nevertheless a "mass layoff" in the aggregate because more than 33 percent of MCGP's employees were laid off during the thirty day period.

D. __MCGP's Defenses__

MCGP asserts two statutory defenses as a basis for either elimination or reduction of its liability. The Court addresses and rejects both defenses in turn.

### 1. *Unforeseeable Business Circumstances*

In imposing the sixty day notice requirement, Congress remained sensitive to the fact that there might exist scenarios where providing such advanced notice is impossible or impracticable. Section 2102(b) is entitled "Reduction of notification period[,]" and provides employers with several enumerated defenses. One of these defenses is commonly referred to as the "unforeseeable business circumstances" defense: "An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." § 2102(b)(2)(A).

Before turning to the merits of such a defense (a fact issue typically reserved for a jury, *see, e.g, Pena v. Am. Meat Packing Corp.*, 362 F.3d 418 (7th Cir. 2004)), a court must satisfy itself that the defendant employer can properly avail itself of the defense. WARN imposes two requirements (both found in § 2102(b)(3)) of employers who seek the shelter of the "unforeseeable business circumstances" defense: "An employer relying on this subsection shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." § 2102(b)(3). Federal courts have interpreted § 2102(b)(3) as imposing a condition precedent to reliance on the

20

"unforeseeable business circumstances" defense. *See, e.g., Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 388-89 (9th Cir. 1994) ("When the notice period is shortened pursuant to [the "unforeseeable business circumstances" exception], the employer *must* give as much notice as is practicable, and 'at the time notice actually is given, [the employer *must*] provide a brief statement of the reason for reducing the notice period, in addition to the other elements [of proper notice] set out in [20 C.F.R.] § 639.7.'" (quoting 20 C.F.R. § 639.9) (emphasis added)); *Grimmer v. Lord Day & Lord*, 937 F. Supp. 255, 258 (S.D.N.Y. 1996) (rejecting defendant employer's argument that non-compliance with § 2102(b)(3) "should have no consequences" because "[a]dopting this position would . . . treat Congress' language in § 2102(b)(3) as meaningless"); *In re Quantegy, Inc.*, 343 B.R. 689, 696 (Bankr. M.D. Ala. 2006) (Williams, B.J.) (awarding plaintiff summary judgment on defendant's WARN Act defenses because notice provided by defendant employer was inadequate under § 2102(b)(3)); *Organogenesis, Inc. v. Andrews*, 331 B.R. 500, 502 (D. Mass. 2005) ("An employer who wants to reduce the notification period must comply with the clear statutory requirement that the termination notice contain an explanation for the shortened time."); *Acevedo v. Heinemann's Bakeries, Inc.*, 619 F. Supp. 2d 529, 536 (N.D. Ill. 2008).

Therefore, prior to addressing the merits of MCGP's unforeseeable business circumstances defenses as to the aggregated January and February 2010 and August 2010 closings, the Court must satisfy itself that MCGP both (1) "[gave] as much notice as [was] practicable[,]" and (2) "at that time . . . [gave] a brief statement of the basis for reducing the

notification period." § 2102(b)(3).  The Court readily concludes that MCGP did not comply with § 2102(b)(3) and, therefore, may not rely on any of the defenses listed in § 2102(b), including the unforeseeable business circumstances defense.

It may be argued that WARN contemplates and makes room for a scenario where the giving of § 2102(b)(3) notice can be excused altogether and the employer can nevertheless rely on one of the defenses listed in § 2102(b)(1)-(2).  The Court does not read the statute in this fashion.  The availability of an impossibility of notice argument hinges on the meaning of "as much notice as is practicable[,]" as that phrase is employed in § 2102(b)(3).  The phrase can be interpreted in one of two ways.  First, it could mean something similar to "as advanced notice as is practicable."  Under this construction, the adjective "much" refers to the timing of the notice.  Second, "much" could refer to the substantiveness of the notice.  Under such a reading, "as much notice as is practicable" could arguably contemplate no notice at all.

For several reasons, the Court reaches the conclusion that the first reading is the one that Congress intended.  As an initial matter, in a setting such as the WARN Act – a statute concerned almost exclusively with time intervals – the first reading ("as advanced notice as is practicable") is a more natural reading in this context.  Furthermore, this reading is reinforced by the words immediately following:  "shall give as much notice as is practicable *and at that time . . . .*" § 2102(b)(3) (emphasis added).  Congress's "at that time" language

refs back to the "as much notice as is practicable" phrase, and demonstrably indicates that Congress's concern in that clause was timing, not substance.[8]

In addition, § 2102(b)(3) imposes two requirements, the second of which concerns the substantiveness of the notice: "and . . . shall give a brief statement of the basis for reducing the notification period." *Id.* To read the first portion of this conjunctive statutory subsection substantively would result in a redundant and potentially contradictory statute. As to redundancy, such a construction of § 2102(b)(3) would impose both a general and a specific directive regarding the notice. In other words, the statute would read, "give as much substantive notice as is practicable, but also give a brief statement of the basis for reducing the notification period." The more general directive would be eviscerated by the specific directive.

As to the contradiction inherent in such a reading, the statute would arguably make room for no notice at all, while at the same time requiring a brief statement for reducing the notification period. How could an employer comply with the brief statement requirement when it is not required to give notice at all?

_____

[8] In fact, § 2102(b) in entitled "Reduction of notification period." Congress's choice of title for this statutory subsection reveals both Congress's concern for timing (with its emphasis on the "period") and Congress's intention that § 2102(b)(3) impose a condition precedent for providing notice at some point in order to invoked one of the listed defenses (or else the subsection would have been more appropriately titled "Reduction or elimination of notification period").

Moreover, the regulations lend themselves to a temporal reading of "as much notice as practicable." 20 C.F.R. § 639.9, discussing the relevant clause of § 2102(b)(3), states: "If [the unforeseeable business circumstances defense] is applicable, the employer must give as much notice as is practicable . . . and this may, in some circumstances, be notice after the fact." *Id.* This regulation is instructive because it reveals that the Department of Labor interprets the "as much notice as is practicable" language as imposing a time, and not a substance, requirement on employers regarding the § 2102(b)(3) notice. *See also* 29 U.S.C. § 2107 (delegating to the Department of Labor the power to "prescribe such regulations as may be necessary to carry out [WARN]"). "[A]s required by *Chevron, U.S.A., Inc. v. Natural Res. Def. Counsel, Inc.*, 467 U.S. 837, 844 (1984), [this Court] accords significant weight to the statutory interpretation of the executive agency charged with implementing the statute being construed, particularly where, as here, that interpretation is incorporated in a formally published regulation." *Martinez-Mendoza v. Champion Intern. Corp.*, 340 F.3d 1200, 1208 n.25 (11th Cir. 2003) (citing *Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1507 (11th Cir. 1993)); *see also Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 183 (3d Cir. 1999) (stating that Department of Labor regulations published pursuant to authority under WARN Act are subject to *Chevron* deference).

Finally, the case law, as far as this Court is able to discern, is unanimous in its support of the view that § 2102(b)(3) imposes a firm requirement of notice prior to being able to rely on one of the defenses listed in § 2102(b)(1)-(2). As discussed above, the cases that are

directly on point view § 2102(b)(3) as setting a condition precedent.  Even the appellate cases

concerning the unforeseeable business circumstances that do not directly tackle § 2102(b)(3)

are instructive to a degree.  For example, in *Pena v. American Meat Packing Corporation*,

the Seventh Circuit considered the *merits* of the unforeseeable business circumstances

defense.  362 F.3d 418 (7th Cir. 2004).  In that case, prior to reaching the merits of the

defense, the court obligatorily stated that WARN "notice was sent to [the] employees . . . ."

*Id.* at 420.  The content of that notice will be discussed below.  The Third Circuit also noted

that a notice was given in the *Elsinore* case.  173 F.3d at 178.

Accordingly, the case law, the regulations, and the unambiguous statutory language

in § 2102(b)(3) support the Court's conclusion that § 2102(b)(3) imposes a condition

precedent:  an employer who seeks to reduce or eliminate the 60 day notice period pursuant

to the unforeseeable circumstances defense must issue a notice pursuant to and that complies

with § 2102(b)(3).  This is an affirmative requirement that cannot be excused.

As to the actual "giving" of notice, it is undisputed that no formal notice was delivered

to any of the affected employees prior to or after the February or August 2010 plant closings.

(Doc. # 62-1, at 8-9.)  However, MCGP argues that no formal notice need have been given

because, for both incidents,  it was obvious what was occurring.  There was intense media

coverage surrounding MCGP's closings,  and MCGP issued press releases and

billboard/internet notifications concerning the events. (Def.'s Resp. 4-6; Benefield Aff. ¶ 15;

Def.'s Interrog. Resps (Doc. # 62-1).)  Clearly, this is not the "giv[ing] . . . notice" that §

2102(b)(3) or the regulations interpreting it contemplated. 20 C.F.R. § 639.8 is entitled "How is the notice served?" and states that "[a]ny reasonable method of delivery to the parties listed under § 639.6 [the affected employees themselves or their representative, if there is one] . . . which is designed to *ensure* receipt of the notice . . . is acceptable[.]" § 639.8 (emphasis added).

Thus, the benchmark for proper notice is the level of certainty regarding the employees' actual receipt of it. In understanding what this means, the regulation concerning delivery of notice continues by listing some examples of proper or improper notice. Proper notice includes first class mail, personal delivery with optional signed receipt, or potentially, insertion of the notice directly into the affected employees' pay envelopes. *Id.* One example of improper notice is a preprinted notice regularly included in each employee's pay check or pay envelope. *Id.*

Applying these principles to MCGP's arguments, it is abundantly clear, as an initial matter, that assumptions of the employees' knowledge of the circumstances does not displace WARN's notice requirement.[9] Second, internet postings and billboard advertisements are likewise insufficient because they do not ensure with any certainty that the affected employees actually received such notice. § 639.8. The statute, § 2102(b)(3), and the regulation, § 639.8, employ verbs such as "give" or "serve" and nouns such as "delivery" and

---

[9] This is so not only because there is a lack of delivery of any notice, but also because the complete omission of notice necessarily means that the employer did not provide a "brief statement of the basis for reducing the notification period." § 2102(b)(3). This will be discussed *infra*.

"receipt."  All of these words contemplate some sort of physically translative action.  In contrast, a "display" on a billboard or internet site plainly does not fit within this category of verbiage because there is no ensured physical transfer of information from employer to employee.  Accordingly, the Court finds that, as a matter of law, no notice was given of the February and August 2010 closings.

Furthermore, even if the Court did conclude that MCGP's displays on billboards and internet sites constituted notice, that notice would be wholly inadequate as failing to provide a "brief statement of the basis for reducing the notification period."  § 2102(b)(3).  In *Alarcon*, the Ninth Circuit "conclude[d] that Congress' purpose in requiring a brief statement must have been to provide employees with information that would assist them in determining whether the notice period was properly shortened."  27 F.3d at 389.  The Southern District of New York provided an additional employer-oriented rationale:  to "focus[ ] employers on the statutory conditions that must be met to reduce the notice period by prohibiting employers from relying on a vague justification for giving shortened notice."  *Grimmer*, 937 F. Supp. 2d at 257.  To those two persuasive rationales, this Court adds one more: to prohibit employers who have failed to provide the requisite 60-day notice from asserting litigation-convenient but factually *post hoc* justifications for their actions.

These inquiries into Congress's objectives for the notice requirement of § 2102(b)(3) shed light on what the notice substantively must convey.  All of these rationales focus on the validity of the defense that will be asserted if sued under the WARN Act.  Accordingly, the

27

*Grimmer* court's statement that an employer must provide "reasonably specific facts[,]" 937 F. Supp. at 257, is to be interpreted as "reasonably specific facts [that would put the employees on notice of the WARN Act, of the defense, and of the facts in support of the defense.]"   Again, the statutory language of giving "a brief statement of the basis for reducing the notification period" makes this plain.   The brief statement requirement is not satisfied when an employer states in general terms the basis for its actions, *see In re Quantegy*, 343 B.R. at 696 (explaining that notices referring to "financial restructuring" and "financial issues" "[do] not explain a reduced notice period"), because there is no reference to WARN, to the defense, or to the reasons for reducing the notification period.   In fact, several courts have decided that a notice that actually does reference the statute and the defense is not enough to satisfy § 2102(b)(3).   *See Grimmer*, 937 F. Supp. 2d at 257 ("By providing that an employer must give a brief statement of the basis for the shortened notice, Congress indicated that it intended something more than a citation to the statute or a conclusory statement summarizing the statutory provision. If an employer could comply with § 2102(b)(3) by simply parroting a statutory exception, this section of the statute would serve no purpose."); *Alarcon*, 27 F.3d at 390 (stating that "reference to the statute alone would not have constituted a sufficient brief statement").   Although by itself not sufficient, a reference to the statute, however, is essential to proper notice because it provides the affected employees with the framework for evaluating the validity of the defense.   One cannot assess the propriety of a legal defense without first having knowledge of the existence of the law.

28

Thus, having assumed that MCGP's press releases/billboards constitute a "notice" within the meaning of WARN, the Court turns to the content of those messages. One such document pertaining to the August 2010 closing is entitled "VictoryLand Schedule" and is attached to Dr. Benefield's affidavit. After listing MCGP's scheduled hours, the document enters into what can be classically described as a rant:

> On Monday, August 9, 2010, VictoryLand Greyhound Park was faced with being illegally raided b [. . .] illegal gambling task force. One can simply type our name into any popular search engine and fo [. . .] shenanigans and threats by the state's self-appointed Czar. The Alabama Supreme Court ruled t [. . .] Governor's office was based simply and solely on the "opinion" of the Governor. Without going in [. . .] madness; VictoryLand, along with other facilities, have been forced to either close or reduce open [. . .] effective with the reopening on Thursday, August 12 2010 VictoryLand is currently operating as [. . .] facility with live greyhound wagering along with simulcast greyhound and thoroughbred wagering [. . .] throughout America. During this period, Quincy's Triple Seven Charity Bingo, the SportsBook, the Oasis Buffet, Luigi's [. . .] Oasis Hotel remain closed until further notice.

(Benefield Aff., Ex. A.)[10]

This statement comes nowhere close to satisfying § 2102(b)(3)'s "brief statement" requirement. Nowhere is the WARN Act mentioned; nowhere is the "unforeseeable business circumstances" defense mentioned; and there are scant facts in support of such a defense.

A second "notice" appears to be two screen shots of internet pages, which contain VictoryLand's and/or Quincy's 777's logo. The e-poster thanks VictoryLand's employees for their support and states in large letters that VictoryLand is "temporarily closed due to Bob

---

[10] The Attachment cuts off a portion of the lines, which is reflected in the Court's block quote.

Riley's attempt to destroy VictoryLand."  (Benefield Aff., Ex. A.)  The "notice" urges the employees to contact their legislator and ends with this exclamatory phrase:  "Let the people vote!"  (Id.).   Again, there is no reference to the WARN Act; no reference to the "unforeseeable business circumstances" defense; and scant facts to support such a defense. Furthermore, there is no date on the notice, and no way for the Court to tell when it was issued and to which plant closing it might apply.

A third "notice" is an unsigned and unattributed memorandum titled "News Release" and was issued on February 5, 2010.  The body of the statement reads in full:

> Shorter, Ala. – Due to its temporary closing, VictoryLand announced that it will distribute employee paychecks at the Macon County Courthouse on Saturday, February 6, 2010, from 8:00 a.m. to 1:00 p.m.  The offsite payroll distribution, according to VictoryLand officials, was necessary because of Governor Riley's ongoing efforts to close bingo facilities around the state.
>
> The payroll distribution will take place on the 2nd floor of the Macon County Courthouse at 101 Rosa Parks Avenue in Tuskegee.
>
> "This is the unfortunate result of the governor's politically motivated anti-bingo campaign," said VictoryLand Chief Operating Officer Lewis T. Benefield.  "Governor Riley has caused thousands of good, hardworking people to be displaced from their jobs at a time when decent-paying jobs are difficult to find."
>
> "The Governor might like to pat himself on the back for bringing big industries, with tax-free incentives, to the state, but he brings them to Alabama's more prosperous counties.  What about the forgotten counties like Macon?  The people here need jobs too, and VictoryLand has been proud to supply them despite the governor's relentless war against us," said Benefield.
>
> Benefield vowed that the fight to re-open VictoryLand, Macon County's largest employer, and enable its more than 1,200 employees to return to work, will continue full force.  He also expressed deep thanks to Macon County for opening its offices for VictoryLand's payroll distribution on Saturday.

(Benefield Aff., Ex. A.)

As stated above, the document is unsigned and there is no way the Court can attribute it to MCGP.  It is beyond argument that MCGP cannot ride the coattails of another entity's document to satisfy its notice requirements under WARN.  Furthermore, like the two previous "notices," there is no reference to the WARN Act; no reference to the "unforeseeable business circumstances" defense; and scant facts in support of such a defense.

In toto, these documents suggest that MCGP was more concerned with its public relations campaign than with apprising its employees of their legal rights.  None of these three items, individually or collectively, come anywhere close to satisfying MCGP's obligation to give notice prior to relying on one of the defenses in § 2102.  Therefore, assuming that these documents do qualify as a "notice," they do not substantively convey enough information "of the basis for reducing the notification period" to be considered adequate under WARN.  § 2102(b)(3).  Again, the Seventh Circuit's *Pena* case is instructive on this point.  The following notice was issued by the employer in that case and was not challenged by the plaintiffs under § 2102(b)(3) either at the district court or at the Seventh Circuit:

> Based on unforeseeable business circumstances, i.e., the United States Department of Agriculture's sudden, dramatic, and unexpected suspension of inspection at our Normal Avenue plant on November 2, 2001, and the implications that this unforeseeable closing has for AMPAC's ability to continue operating the plant in the future, AMPAC has decided to permanently close the plant on November 16, 2001.  As a result, your employment with AMPAC will be permanently terminated on November 16, 2011.
>
> [...]

> This notice is given to you pursuant to the Worker Adjustment and Retraining Notification Act, which requires employers to give notice to employees who will lose their jobs due to a plant closing. Because this step was based upon the USDA's sudden and unforeseeable decision to suspend inspection at this plant, we were unable to provide you with greater advance notice.

*Pena v. Am. Meat Packing Corp.*, 258 F. Supp. 2d 864, 870 (N.D. Ill. 2003). The notice in *Pena* stated both the statute and the defense, and provided a brief statement as to the basis for the reduction in the notification period. This Court is reasonably confident that such a notice, if challenged, would have been found sufficient under § 2102(b)(3). Contrasting the (likely) § 2102(b)(3) compliant notice in *Pena* to the "notices" in this case is illustrative of just how deficient MCGP's messages are in complying with § 2102(b)(3)'s "brief statement" requirement.

To summarize, MCGP provided no notice to be able to avail itself of the unforeseeable business circumstances defense, as is required under § 2102(b)(3). Furthermore, even if MCGP's submitted documents can be called notices, they are inadequate under § 2102(b)(3)'s brief statement requirement as a matter of law. Thus, Plaintiffs are entitled to summary judgment on MCGP's "unforeseeable business circumstances" defense as it pertains to the February and August 2010 closings.[11]

---

[11]   Assuming, arguendo, that the Court arrived at the merits of MCGP's unforeseeable business circumstances defense – a fact issue – MCGP bears the burden of proving to the jury that the "business circumstances were not *reasonably* foreseeable." § 2102(b)(2)(A). The *Cornerstone* case arguably put MCGP on notice as of late 2009 that its electronic charity bingo was, in fact, illegal gambling. That MCGP would be subject to a criminal investigation for illegal conduct seems quite reasonably foreseeable. It appears doubly reasonably foreseeable as of August 2010, when MCGP had already been threatened with raids once. Thus, the Court would be inclined to deny MCGP's

## 2.      *The Good Faith Defense*

Section 2104(a)(4) provides that the Court may reduce a WARN Act defendant's

liability in certain circumstances:

> If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter, the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.

29 U.S.C. § 2104(a)(4).

"The 'good faith' defense requires proof of the employer's subjective intent to comply

with the [WARN] Act, as well as evidence of objective reasonableness in the employer's

application of the Act." *Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 730 (7th Cir. 2004)

(citing cases); *see also Frymire v. Ampex Corp.*, 61 F.3d 757, 767-68 (10th Cir. 1995) (citing

cases).   As the employer, MCGP bears the burden of proof on both elements of this

mitigation defense.   *Id.*   Moreover, because WARN is a remedial statute, the good faith

defense "must be narrowly construed."   *Id.*   For example, "[m]ere ignorance of the WARN

Act is not enough to establish the good faith exception."   *Childress v. Darby Lumber, Inc.*,

357 F.3d 1000, 1008 (9th Cir. 2004).   Finally, this Court enjoys a substantial amount of

discretion with regard to this defense.   *See Saxion v. Titan-C-Mf'g, Inc.*, 86 F.3d 553, 561-62

(6th Cir. 1996) (stating that "even where good faith is manifest, . . . the decision to reduce

the amount of damages is within the discretion of the district court").

---

summary judgment motion on the merits of the defense.

MCGP has failed to meet its summary judgment burden with respect to the good faith defense. First, MCGP has submitted no temporally relevant evidence of its subjective intent to comply with the WARN Act.[12] Affidavits prepared for ongoing WARN Act litigation reek of self-service and cannot suffice for the subjective component of this narrowly construed defense. *See Frymire*, 61 F.3d at 768-69 (considering evidence from time of WARN Act violation and finding subjective component satisfied). *See Washington v. Aircap Indus., Inc.*, 860 F. Supp. 307, 318 (D.S.C. 1994) (considering evidence of employer's meeting with counsel at time of WARN Act violation but nevertheless rejecting good faith defense because of employer's "cavalier[ ]" treatment of the situation).

Moreover, MCGP has failed to demonstrate that it satisfies the objective component of the good faith defense. Assuming that MCGP had a subjective intent to comply with the Act, its complete failure to provide any kind of notice before, at the time of, or after the February or August 2010 plant closings, even when it became obvious that notice would be required,[13] likely precludes MCGP from obtaining any reduction in damages based upon the good faith defense.

---

[12] The Court considers "temporally relevant" evidence to be evidence from the time of the WARN Act *violation*.

[13] Indeed, as discussed above, MCGP has essentially stipulated that plant closings occurred in February 2010 and August 2010.

The Court, in its discretion, will decline to grant MCGP's summary judgment motion as it relates to the "good faith" defense.  However, MCGP may re-argue the defense, along with any additional evidence it may have, as the case progresses on damages.

**E.**     **Plaintiff's Motions to Strike**

As an initial matter, Plaintiffs' motion to strike MCGP's affirmative defenses (Doc. # 43) is partially mooted.  Second, despite the fact that judges enjoy discretion to strike pleadings pursuant to Rule 12(f), "striking a party's pleading . . . is an extreme and disfavored measure."  *See BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.3d 1045, 1057 (5th Cir. 1982) (stating that "motions to strike a defense are generally disfavored"); *see also* 5C C. Wright & A. Miller, *Federal Practice and Procedure* 3d § 1380 (2004) (stating that "motions under Rule 12(f) are viewed with disfavor by the federal courts and are infrequently granted").  Third, this Court has joined the growing minority of courts to have held that the plausibility pleading standards of *Twombly*/*Iqbal* do not apply to affirmative defenses.  *See Equal Emp't Opp. Comm'n v. Joe Ryan Enter., Inc.*, No. 3:10cv795, 2012 WL _____ (M.D. Ala. _____) (Fuller, J.) (published).  For these reasons, the Court will deny Plaintiffs' motion to strike affirmative defenses (Doc. # 43).

Plaintiffs' motion to strike a portion of MCGP's summary judgment brief (Doc. # 84) is also mooted by the stipulations entered into between the parties (Doc. # 106) and by MCGP's withdrawal of the offending employee roster.

35

## V.  CONCLUSION

In arriving at the disposition outlined above and ordered below, the Court is mindful that this case involves "controlling question[s] of law as to which there is substantial ground for difference of opinion."  28 U.S.C. § 1292(b).  Moreover, despite the disposition of the liability phase of this case, resolving WARN Act damages will involve significant expenditures of time and labor on the part of the parties and the Court.  In fact, yet to be decided upon is the procedure to be used for this monumental task.  Given the posture of this case and the questions involved, an interlocutory appeal would "materially advance the ultimate termination of the litigation."  *Id.*  Accordingly, the Court certifies this case as appropriate for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  Although the Court will not stay further proceedings at this juncture, it will entertain any such motion if an interlocutory appeal is both pursued and taken up by the Eleventh Circuit.

Accordingly, it is ORDERED:

(1)    Plaintiffs' Motion for Partial Summary Judgment as to WARN Act liability and as to MCGP's "unforeseeable business circumstances" defense (Doc. # 44) is GRANTED;

(2)    Defendant MCGP's Motion for Summary Judgment (Doc. # 73) is DENIED;

(3)    Plaintiffs' Motions to Strike (Docs. # 43, 84) are DENIED;

(4)    The pretrial hearing and trial in this case, scheduled for July 24, 2012, and August 20, 2012, respectively, are CANCELLED; and,

(5)     The case, subject to the above observations on interlocutory appeals, will

proceed on WARN Act damages.

DONE this 6th day of July, 2012.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE